UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SUPERON SCHWEISSTECHNIK INDIA LTD., : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> UNITED STATES OF AMERICA, : <br> : <br> Defendant. : <br> : | Court No. 21-00570 <br><br> **Non-Confidential Version** <br> Business Proprietary Information <br> has been removed from pages 5–11. |

# COMPLAINT

Plaintiff Superon Schweisstechnik India Ltd. ("Plaintiff" or "Superon"), by and through the undersigned attorneys, alleges against Defendant United States, acting through the U.S. Customs and Border Protection ("Customs" or "CBP"), as follows:

## JURISDICTION

1. Plaintiff Superon brings this action under 19 U.S.C. § 1515 to contest CBP's denial of Superon's protest (Protest Number 2006-21-106267) against CBP's improper classification of Superon's imported merchandise in Entry Number BUU-1287294-7 as non-flux materials. CBP's erroneous classification subjected the imported merchandise to a duty of 25 percent under Section 232 of the Trade Expansion Act of 1962 ("Section 232").

2. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(a), which confers "exclusive jurisdiction" to the U.S. Court of International Trade over "any civil action commenced to contest the denial of a protest." 28 U.S.C. § 1581(a).

**PARTIES**

3. Plaintiff Superon manufactures premium stainless-steel welding electrodes and wires for use in an array of industries. Superon's products include welding consumables and stainless-steel wires that it sells to thousands of retailers across the globe, including in the United States. Superon is headquartered in Gurgaon (Haryana), India.

4. Acting through CBP, Defendant United States of America made the contested decision regarding classification and collected the duties, taxes, and fees paid on Entry Number BUU-1287294-7.

**STANDING & TIMELINESS OF THE ACTION**

5. Superon is the importer of record for certain welding wire consumables entered under Entry Number BUU-1287294-7, which was entered on June 11, 2019 and liquidated on August 23, 2019.

6. Superon paid all liquidated duties, taxes, and fees associated with the importation of the subject welding wire consumables on November 25, 2019.

7. On February 12, 2020, Superon submitted Protest Number 2006-21-106267 to challenge CBP's classification of the welding wire consumables as a non-flux material under Harmonized Tariff Schedule of the United States ("HTSUS") subheading 7223.00.1061 and to recover the 25 percent duty that it paid for the welding wire consumables imported under Entry Number BUU-1287294-7, with accrual of interest.

8. CBP denied Protest Number 2006-21-106267 on April 28, 2021.

9. To challenge CBP's denial of a protest, the protester must commence an action in this Court "within one hundred and eighty days after the date of mailing of notice of denial of a protest." 28 U.S.C. § 2636(a). Superon timely filed the summons in this action on October 22,

2021, and therefore has standing subject to 28 U.S.C. §§ 2631(a), 2636(a).

## LEGAL BACKGROUND

10. CBP reviews protests filed under 19 U.S.C. § 1515. In such protests, importers may challenge CBP's "classification and rate and amount of duties chargeable" on the imported merchandise. *Id.* § 1514(a)(2).

11. CBP "shall review the protest and shall allow or deny such protest in whole or in part." 19 U.S.C. § 1515(a). Any denial of a protest is final and conclusive unless the importer timely files a civil action challenging CBP's decision in this Court. 28 U.S.C. § 2636.

12. CBP classifies materials pursuant to the HTSUS. 19 U.S.C. §§ 1500(b), 1202.

13. While CBP's tariff classifications and methods for testing merchandise are entitled to a statutory presumption of correctness, 28 U.S.C. § 2639(a), this presumption is merely a burden of proof placed on the challenger, which can be overcome by "showing that {the agency's} methods or results are erroneous." *American Sporting Goods v. United States*, 259 F. Supp. 2d 1302, 1307-08 (Ct. Int'l Trade 2003). "If a *prima facie* case is made out, the presumption is destroyed, and the Government has the burden of going forward with the evidence." *Id.* at 1308.

14. Nevertheless, in civil actions contesting the denial of a protest under Section 515 of the Tariff Act of 1930, this Court is to make a *de novo* determination based on the record developed before it. 28 U.S.C. § 2640(a)(1); *Nat'l Presto Indus., Inc. v. United States*, 783 F. Supp. 2d 1287, 1289 (Ct. Intl. Trade 2011) ("It is ultimately the Court's duty to determine the correct classification{,}" which is reviewed *de novo*.).

15. Moreover, CBP's classification rulings are entitled to deference proportional only to the ruling's "'power to persuade,'" with "'thoroughness, logic,'" and "the consistency and predictability of an agency's position" being critical "factor{s} in assessing the weight that position

is due." *Calif. Indus. Products, Inc. v. United States*, 350 F. Supp. 2d 1135, 1140 (Ct. Int'l Trade 2004) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001), and *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

16.   CBP must provide public notice and opportunity for comment on any "interpretive ruling or decision" that would "modify {} or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days," 19 U.S.C. § 1625(c)(1), or has "the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions," *id.* § 1625(c)(2).

17.   An "interpretive ruling or decision" includes, among other things, "ruling letters, {} protest review decisions" and "decisions that are the functional equivalent of interpretive rulings or decisions," *Kahrs Int'l, Inc. v. United States*, 645 F. Supp. 2d 1251, 1285 (Ct. Int'l Trade 2009), such as notices of action, *Int'l Custom Products, Inc. v. United States*, 549 F. Supp. 2d 1384, 1391 (Ct. Int'l Trade 2008).

## FACTUAL BACKGROUND UNDERLYING CAUSES OF ACTION

### I.   Superon's Welding Wire Consumable Products

18.   Superon imports into the United States stainless steel round wires, including three products pertinent to this dispute: (1) its Metal in Gas ("MIG") stainless steel round wire, with a diameter ranging from 0.8 mm – 1.6 mm, which serves as a consumable electrode in the electronic arc welding process and is imported in spools; (2) its Tungsten Inert Gas ("TIG") stainless steel round wire with a diameter of 0.8 mm – 1.6 mm, which serves as a consumable filler in the gas tungsten arc welding process, but not as an electrode; and (3) its Submerged Arc Welding ("SAW") stainless steel round wire with a diameter of 1.6 mm – 4 mm, which has low carbon content and serves as a consumable electrode in the welding process.

19. The MIG, TIG, and SAW wires are all coated with a single proprietary formula of [████████████████████████████████████████████████████████████████████████████████████] that functions as a flux material (or fluxant) for welding. Superon developed the proprietary formula's [████████████████] component to be used by Superon as a fluxant.

20. Flux materials may consist of a wide variety of chemical compounds, depending on the desired characteristics and uses, and are applied to shield material from oxidation during welding and from oxygen and other harmful gases, to chemically remove oxides or other films that would inhibit bonding or otherwise augment bonding.

21. As for the specific components of Superon's proprietary formula, [████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████].

## II.   CBP's Classifications of Superon's Products

22. On August 15, 2018, Superon requested a tariff classification ruling from CBP covering several types of its round wire, including the same MIG, TIG and SAW wires at issue in this case.

23. On September 7, 2018, after reviewing product specifications that Superon

5

submitted for the agency's review, CBP issued Customs Ruling Number N300086 concluding that "{t}he MIG, TIG, and SAW wires are coated with a mix of methylene chloride and dichloroethylene, which functions as a flux material for welding." On that basis, CBP classified the MIG and SAW wires under HTSUS subheading 8311.10.0000 (duty rate of free) and the TIG wires under HTSUS subheading 8311.90.0000 (duty rate of free).

24. HTSUS subheading 8311.10.0000 provides for:

> Wire, rods, tubes, plates, electrodes and similar products of base metal or of metal carbides, coated or cored with flux material, of a kind used for soldering, brazing, welding or deposition of metal or of metal carbides; wire and rods, of agglomerated base metal powder, used for metal spraying; base metal pars thereof: Coated electrodes of base metal, for electric arc-welding

25. HTSUS subheading 8311.90.0000 provides for:

> Wire, rods, tubes, plates, electrodes and similar products of base metal or of metal carbides, coated or cored with flux material, of a kind used for soldering, brazing, welding or deposition of metal or of metal carbides; wire and rods, of agglomerated base metal powder, used for metal spraying; base metal parts thereof; Other

### III.  Protest Number BUU-1287294-7

26. On June 11, 2019, Superon entered a shipment containing its MIG, TIG, and SAW steel round wires under Entry Number BUU-1287294-7. Consistent with CBP's prior Ruling Number N300086, Superon classified the MIG and SAW wires under HTSUS subheading 8311.10.0000 and the TIG wires under HTSUS subheading 8311.90.0000.

27. On August 19, 2019, CBP issued a Notice of Action regarding the classification of Superon's steel wire imported under Entry Number BUU-1287294-7. The Notice of Action stated that, as a result of laboratory testing and examination conducted by CBP ("First CBP Lab Report"), "[█████████████████████████████████]" in the imported merchandise. In subsequent correspondence with CBP, Superon learned that CBP used conventional test

methods, rather than the globally recognized specialized methods necessary for identifying the type of [▮▮▮▮▮▮▮▮▮▮] coating on Superon's wires. Consequently, CBP concluded that the MIG, TIG, and SAW wire products were misclassified and should be refiled, classifying the entry under "HTS 7223.00.1061 / 9903.80.01." HTSUS subheading 7223.00.1061 covers uncoated stainless steel and round wire of a diameter between 1.52 and 5.1 millimeters.

28. CBP liquidated Entry Number BUU-1287294-7 on August 23, 2019, subject to 25 percent duties, which Superon paid on November 25, 2019.

29. Superon filed a protest (Protest Number 200621106267) regarding this liquidated entry on February 12, 2020, contesting CBP's conclusion that the merchandise was misclassified and arguing that it was properly classified under HTSUS subheadings 8311.10.0000 and 8311.90.0000. Superon argued that the originally entered classifications were correct in light of CBP's binding prior Ruling Number N300086, which classified Superon's MIG and SAW wires under HTSUS 8311.10.0000 and its TIG wires under HTSUS 8311.90.0000.

30. In support of its protest, Superon provided results of laboratory analysis conducted by independent third-party Shirey Analytical Services ("SAS") on January 27, 2020. For its examination, SAS used the Fourier Transform Infrared ("FTIR") Spectroscopy Test applied to the surface of the rod to examine Superon's steel wires. As part of its examination, SAS produced photomicrographs of the surface of the rod, which show the presence of the coating. The FTIR Spectroscopy Test, as well as the Ultra Violet Light Test and Welding Test, are specialized tests used globally to detect organic paints and coatings and are the only proper methods for identifying [▮▮▮▮▮▮▮▮▮▮] coatings like those on Superon's wire products. And as Superon explained to CBP prior to filing its protest, conventional testing methods like that which CBP used for its own laboratory analysis cannot detect these kinds of coatings.

31. As a result, SAS properly concluded that Superon's wires have a flux coating. It specifically noted that the wires contain "[█████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████]"

32. On April 28, 2021, CBP denied Superon's protest, indicating that it was relying on its own internal laboratory reports, dated April 22, 2021 ("April 22, 2021 Lab Reports"), which concluded that Superon's products were "stainless steel rod *with no coating*." However, as Superon later learned, CBP's laboratory used X-Ray Fluorescence ("XRF") and Scanning Electron Microscopy ("SEM") testing for its analysis, rather than the specialized tests necessary for detecting non-organic coatings. Though both XRF and SEM tests are commonly used in coating analyses, as SAS explained, they are "not ideally suited for the detection of thin-film organic coatings" like those on Superon's wires. This is because the amount of coating used by Superon on its wires is too little to properly detect and analyze using conventional methods.

### IV. Superon's Subsequent Efforts to Correct Customs' Unsupported Protest Denial

33. In several subsequent exchanges with and supplemental submissions to CBP following its protest denial, Superon explained that the tests on which CBP's laboratory relied for its April 22, 2021 analysis are not designed to detect [███████████] and, predictably, failed to find evidence of a coating on Superon's products. As a result, Superon argued, CBP's conclusion that the wires are not coated in a flux material is undermined by CBP's use of improper testing methodology for identifying organic flux materials.

34. On or around November 4, 2021, CBP retested the wire samples using the FTIR

testing methodology ("November 4, 2021 Lab Reports"). Rather than using the FTIR Microscopy test Superon requested, the CBP laboratory first dissolved the [          ] off the wire rods and then performed an FTIR test on the dissolved coating, which resulted in a manipulation of the product (*i.e.*, removal of the coating) prior to testing. In addition to the FTIR testing methodology, the CBP laboratory also used a Gas Chromatography/Mass Spectrometry ("GCMS") testing methodology on the wire samples tested. Again, rather than using the thermal desorption (pyrolysis) extraction method Superon requested, the CBP laboratory used a chemical extraction method for its GCMS testing, which can impact the chemical integrity of the flux coating. Using these testing methodologies, though employing imprecise processes, CBP nevertheless detected evidence of the flux coating, noting in its supporting worksheet for the laboratory reports that the samples "[                              ]," but this information was not provided in the laboratory report to the import specialist.[1] Critically, as Superon explained to CBP following the retesting, the extraction method that the CBP laboratory used in both the FTIR and GCMS tests (*i.e.*, soaking the samples in chloroform and methanol for 15 minutes) would not be capable of dissolving the underlying stainless steel wire. Therefore, the [       ] identified via the CBP laboratory's tests could have only been on the surface of the wire as a coating.

35. Notwithstanding these findings, CBP concluded on the first page of the November laboratory report that "{a}n analysis by FTIR . . . *reveals no organic coating*." Yet, as Superon argued in supplemental correspondence, this conclusion is undermined—indeed, contradicted—by evidence from CBP's *own* laboratory reports which reveal evidence of the organic coating Superon uses on its wire consumables, *i.e.*, [

---

[1] Using the FTIR methodology, the CBP laboratory detected [          ] in six of six tests conducted. Using the GCMS methodology, the CBP laboratory detected [          ] in four of six tests conducted.

▮] that functions as a flux material for welding.

36.    For a third time, on March 9, 2022, CBP again tested Superon's wires using the FTIR method and detected a "trace amount of unidentified *organic matter*."

37.    Superon's MIG, SAW, and TIG coated wire products covered in Entry No. BUU-1287294-7 are the same products that were covered by Entry/Line Nos. 906-01984753/0001, 906-03033831/0001, and 906-03033740/0001, which are the Entry/Line Nos. from which the CBP laboratory took samples for the tests conducted on April 22, 2021, November 4, 2021, and March 9, 2022.

## STATEMENT OF CLAIMS

### Count I (19 U.S.C. §§ 1514-1515):
### Customs' denial of Protest Number 200621106267 improperly classifies Superon's MIG, TIG, and SAW wires under HTSUS subheading 7223.00.1061

38.    Superon repeats and alleges paragraph numbers 18 through 37 as if fully set forth herein.

39.    CBP's erroneous reclassification of Superon's MIG, TIG and SAW wires under HTSUS subheading 7223.00.1061 is based on CBP's improper testing procedures that failed to detect the flux coating on the imported merchandise, and CBP's subsequent failure to consider the existence of flux material identified in CBP's retests of the imported merchandise.

40.    When the imported merchandise is examined using appropriate testing procedures and considered against the record as a whole, the evidence demonstrates that Superon's wires are properly classified as flux-coated welding wire under HTSUS subheadings 8311.10.0000 and 8311.90.0000. In particular, the evidence shows that the imported materials are "coated {} with flux material, of a kind used for soldering, brazing, welding or deposition of metal or of metal carbides."  Specifically, the record shows that the materials contain a [▮

10

███████████████] which functions as a unique anti-spatter flux coating in Superon's MIG, TIG, and SAW wires, which Superon advertises in its marketing materials. Indeed, Superon specifically developed [███████████████████] to be used by Superon as a fluxant.

41. This conclusion is substantiated by the independent third-party laboratory reports that Superon retained and presented to CBP. It is also supported by CBP's *own* laboratory results, which, when using the proper testing methodology, detected the flux coating and in its supporting worksheets for the lap reports noted that each sample was [████████████████████].

42. CBP's erroneous reclassification of Superon's MIG, TIG and SAW wires under HTSUS subheading 7223.00.1061 is also due in large part to the agency's ignoring evidence—indeed, the agency's own evidence—that contradicts the findings that served as the basis of CBP's protest denial.

43. CBP therefore erred as a matter of law when it classified Superon's wires under HTSUS subheading 7223.00.1061 instead of HTSUS subheadings 8311.10.0000 and 8311.90.0000.

**Count II (19 U.SC. § 1625(c)(1)):**
**Customs violated the law by effectively revoking its Customs Ruling Number**
**N300086 without first complying with Section 1625(c)(1)**

44. Superon repeats and alleges paragraph numbers 18 through 43 as if fully set forth herein.

45. Section 1625(c)(1) requires CBP to provide notice and an opportunity for the public to submit comments before issuing any final ruling or decision that "modif{ies} (other than to correct a clerical error) or revoke{s} a prior interpretive ruling or decision which has been in effect for at least 60 days{.}"

46. CBP did not follow the procedures mandated by Section 1625(c)(1) before

reclassifying Superon's identical products under HTSUS subheading 7223.00.1061.

47. In particular, CBP did not provide notice or an opportunity to comment as to its denial of Protest Number 2006-21-106267, which effectively revoked Customs Ruling Number N300086.

48. CBP therefore erred as a matter of law when it failed to follow the procedures set forth in 19 U.S.C. § 1625(c)(1).

### Count III (19 U.S.C. § 1625(c)(2)):
### Customs violated the law by modifying the treatment it accorded to Superon's substantially identical transactions without first complying with Section 1625(c)(2)

49. Superon repeats and alleges paragraph numbers 18 through 48 as if fully set forth herein.

50. Section 1625(c)(2) requires CBP to provide notice and an opportunity for the public to submit comments before issuing any final ruling or decision that "ha{s} the effect of modifying the treatment previously accorded by {CBP} to substantially identical transactions{.}"

51. CBP did not follow the procedures mandated by Section 1625(c)(2) before modifying its treatment of substantially identical transactions.

52. Since CBP issued Ruling Number N300086 on September 7, 2018, Superon entered Entry Number BUU-1287294-7 (among others), which included MIG, TIG, and SAW wires and classified those products under HTSUS subheadings 8311.10.0000 and 8311.90.0000, consistent with Ruling Number N300086.

53. CBP's reclassification of Superon's substantially identical transaction in Entry Number BUU-1287294-7 effectively modified CBP's longstanding classification of Superon's MIG, TIG, and SAW wires based on Customs Ruling Number N300086, without following the requisite notice and comment procedures for course reversals of this kind.

54. CBP therefore erred as a matter of law when it failed to follow the procedures set forth in 19 U.S.C. § 1625(c)(1).

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests that this Court enter judgement in its favor and:

(1) declare that CBP unlawfully classified Superon's imported merchandise in Entry Number BUU-1287294-7 under HTSUS subheading 7223.00.1061;

(2) order CBP to classify Superon's imported merchandise in Entry Number BUU-1287294-7 under HTSUS subheading 8311.10.0000 (duty rate of free) for the MIG and SAW wires and under HTSUS subheading 8311.90.0000 (duty rate of free) for the TIG wires;

(3) direct the appropriate CBP port to reliquidate the subject merchandise accordingly and to refund the 25 percent duty that Superon paid for the welding wire consumables imported under Entry Number BUU-1287294-7, with accrual of interest;

(4) award Superon costs and reasonable attorney fees; and

(5) grant such other and further relief as may be just and proper.

Dated: October 30, 2025              Respectfully submitted,

                                                           */s/ Lars-Erik A. Hjelm*
                                                          Lars-Erik A. Hjelm
                                                          Devin S. Sikes

                                                          AKIN GUMP STRAUSS HAUER & FELD LLP
                                                          2001 K Street, NW
                                                          Washington, D.C. 20006

                                                          *Counsel to Plaintiff*

**CERTIFICATE OF SERVICE**

Pursuant to U.S. Court of International Trade Rule 4(h), I hereby certify that copies of Plaintiff's Complaint were served upon the following counsel for Defendant by the ECF system and by certified mail, return receipt requested at the following addresses:

Guy Eddon
U.S. Department of Justice
International Trade Field Office
26 Federal Plaza
Room 346
New York, NY 10278

CBP Assistant Chief Counsel
U.S. Department of Homeland Security
International Trade Litigation
U.S. Customs and Border Protection
26 Federal Plaza
Room 258
New York, NY 10278

    */s/ Lars-Erik A. Hjelm*
    Lars-Erik A. Hjelm